UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ELIJAH FULTON,

      Plaintiff,                                Case No. 1:15-cv-53

vs.

                                           Magistrate Judge Bowman

WESTERN BROWN LOCAL SCHOOL
DISTRICT BOARD OF EDUCATION,

      Defendant.

**MEMORANDUM OF OPINION AND DECISION**

Plaintiff brings this action through counsel against defendant Western Brown Local School District Board of Education ("Western Brown") alleging that he was subjected to a course of racial harassment by teachers and students while he was enrolled at Western Brown Middle School and Western Brown High School. In Plaintiff's Second Amended Complaint, he brings two causes of action. The first is an alleged violation of Title VI of the Civil Rights Act of 1964 for harassment because of his race. The second cause of action is a violation of §1983 of the Civil Rights Law for alleged racial harassment that violated his rights under the Fourteenth Amendment of the Constitution. This matter is now before the Court on the Defendant's motion for summary judgment (Doc. 42) and the parties' responsive memoranda and supporting documents. (Docs. 44-50, 54, 58).

The parties have consented to the jurisdiction of the United States Magistrate Judge for disposition of this matter. (Doc. 22).

**I. Background and Facts**

In 2011, Plaintiff Elijah Fulton (hereinafter "Eli"), his parents, and his four younger siblings moved into the Western Brown School Districts to live on a farm and be closer to family. (Doc. 45, Kelly Bishop-Fulton Dep. 26, Feb. 18, 2016).[1] After deciding to move, Eli's mother began looking for a position at Western Brown and was soon hired to teach high school Spanish. *Id.* Eli is the eldest son of the Fulton's five children and is biracial. (Doc. 56, Dale Fulton Affidavit ¶3, July 10, 2016). In the fall of 2011, Eli attended eighth grade at Mt. Orab Middle School in the Western Brown School District. (Doc. 45, Kelly Bishop-Fulton Dep. 30, Feb. 18, 2016). Starting in eighth grade, and continuing through ninth and tenth grade, problems arose, including but not limited to the following:

<u>**Eighth Grade**</u>

*1.     Incident One*

Mr. Baird was Plaintiff's social studies teacher during his eight grade year. (Doc. 44, Plaintiff's Dep. at p. 21). Mr. Baird made a comment in class about Cincinnati that bothered Plaintiff. *Id.* Mr. Baird was talking about a trip he made to Cincinnati and he shared his experience when he took a wrong turn down a road and saw some kids on the sidewalk with snowballs so he quickly turned around and sped away. (*Id.* at pp. 21-22). Mr. Baird mentioned that the scary kids were "not white" which made other kids in the class laugh.  (Doc. 44, E. Fulton Dep. at 21-23).  This exchange made Plaintiff feel uncomfortable as the only black student in class who recently transferred from the Cincinnati area.  *Id.* Plaintiff reported the incident to his parents.

---

[1] Prior to moving to the farm, Plaintiff lived and attended school in Cincinnati.

Plaintiff's parents discussed the incident with the school's superintendent Christopher Burrows and also with a school board member. (Doc. 56 at ¶ 4, Doc. 45 at 33). Mr. Baird apologized privately to Plaintiff. (Doc. 44 at 25). The class was not addressed. (Doc. 45 at 34).

### 2. Incident Two

Later that same year, while surrounded by classmates at lunchtime, student J.A.[2] made disparaging comments directly to Eli about black people. (Doc. 44 at 26-28). Other white students also participated in these conversations.  After hearing several complaints from Plaintiff, his mother emailed the lunchroom monitor and asked him to watch over the situation.  (Doc. 45, Bishop-Fulton dep. at 51

Lillian Cook, the school's vice principal, investigated this situation after meeting with Plaintiff's father on May 1, 2012. (Doc. 46, Dep. of Lilly Cook at pp. 17-18; ¶ 5 of Affidavit of Lilly Cook). Mr. Fulton told Ms. Cook that there were inappropriate racial remarks made at the lunch table. (Doc. 46, Dep. of Lilly Cook at p. 18). She spoke to six different students during her investigation. *Id.* at pp.18-19. The stories did not match up as she was told stories that the students were talking about black athletes versus white athletes and who was smarter and who was better. (*Id.* p. 19; ¶¶ 7-8 of Affidavit of Lilly Cook).

One of the students also commented about black athletes being so fast because of their heredity and in that they had to run away as slaves a long time ago. (Doc. 46, Dep. of Lilly Cook at p. 19). She deemed the comments inappropriate, but not racial, and no punishment was given. (Doc. 46, Cook dep. at 21). One of the students

---

[2]  The Court presumes that the students identified in this action are no longer minors. However, in an abundance of caution the Court has chosen to use only their initials as identification.

was later disciplined for calling Plaintiff a "snitch" shortly after Ms. Cook warned the students about the inappropriate comments. *Id.* at 22.

### 3. Incident Three

K.M., a fellow student, called Plaintiff a "nigger" while they were playing basketball in the gym. (Doc.44, E. Fulton dep. at 31). Plaintiff immediately went to the office to report the incident. *Id.* During Ms. Cook's investigation, K.M. admitted saying the word. (Doc. 46, Dep of Lilly Cook at p. 34). She was subsequently disciplined. (*Id.* at p.40; Dep. of Plaintiff at p. 34). Ms. Cook gave KM three days in-school suspension for violation of the Code of Conduct. (Doc. 46, Dep. of Lilly Cook at p. 48; ¶ 12 of Affidavit of Lilly Cook).

### 4. Incident Four

Plaintiff was playing basketball outside and N.P. shoved him in the back into a trash can as the Plaintiff was going up for a lay-up. (Doc. 44, at p. 36). N.P. just stared at the Plaintiff and walked away. *Id.* Plaintiff did not know what his problem was so he went to either Ms. Armstrong, the principal, or Ms. Cook to let someone know what had happened just in case N.P. tried to say Plaintiff started something. *Id.* Plaintiff did not say that he wanted N.P. in trouble but Plaintiff was afraid the story would be turned around on him and that he was the one who started the incident. (Doc. 46, Dep. Lilly Cook at pp. 15-16).

### 5. Incident Five

During the third or fourth quarter of the school year, a group of girls made comments to him about going back to the ghetto where he came from or they would

punch him in the face. (Doc. 44, E. Fulton Dep. at p. 39). Plaintiff reported this to either Ms. Armstrong or Ms. Cook who brought the girls in and spoke with them. *Id.* at p. 41.

**Ninth Grade**

6. *Incident Six*

Plaintiff was told that J.M. had written KKK on one of the lab desks in the biology room. *Id.* at pp 43-44. Plaintiff did not see these letters written on the desk. *Id.* at p. 44. He was told that KKK was written on the desk by another student who said that he saw J.M. write it and pointed at the Plaintiff. *Id.* at pp. 44-45. Plaintiff then reported it to the high school Principal Ms. Cooper. *Id.* at p. 45. Plaintiff did not have any other problems with J.M. after this incident. *Id.* at p. 50. Ms. Cooper was not able to substantiate the KKK incident as the biology teacher had not seen it on a desk or table in his room. (*Id.* at p. 73).  Ms. Cooper found the KKK claim to be false because no other student could substantiate the claim. (Doc. 48, Cooper Dep. 75).

7. *Incident Seven*:

Plaintiff heard one of his teammates, G.W., say "He's such a nigger" in the locker room. (Doc. 44 at 51).  G.W. stated that it was not directed at Plaintiff.  *Id.*  Plaintiff did not report this incident.  (*Id.* at 52).

**Tenth Grade**

8. *Incident Eight*

Mr. Donathan was Plaintiff's American History teacher for his tenth grade year. *Id.* at p. 54. Plaintiff complained about comments made by Mr. Donathan during class about affirmative action and that the white man was the most discriminated group in American history. *Id.* at pp. 54-56.  Mr. Donathan became aware of this issue when

Plaintiff's father came into see him and discussed this affirmative action discussion. (Doc. 47, Dep. of Wendel Donathan at pp. 25-26). Mr. Donathan explained his position to Plaintiff's father and there was no further discussion. *Id.* at pp. 25-26.

    *9.*    *Incident Nine*

During the basketball season his sophomore year, Plaintiff had problems with some of the other players on the basketball team. (Doc. 44, E. Fulton Dep. at pp.75-84). One incident involved J.H. (*Id.* at p. 75). One of Plaintiff's friends, B.B. scored his first varsity points and the Plaintiff was congratulating him from the bench when he heard J.H. say something that included Plaintiff's name. (*Id.).* Plaintiff asked J.H. what he said, but Jared did not respond. (*Id.* at pp. 75-76). After the game, Plaintiff asked Q.K., one of his friends, what had happened. (*Id.*). Q.K. told the Plaintiff that J.H. said that Plaintiff was the reason why he wants to hate black people. *(Id.).* Plaintiff told his parents about this incident and he met with the Athletic Director Tim Cook. (*Id.* at p. 76).

    *10.*    *Incident Ten*

In February of 2014, Western Brown High School was hosting the OHSAA basketball sectional tournament where it was discovered someone had carved the words "no niggers allowed" into a corkboard in a visiting teams' locker room. (Doc. 50, Dep. of Tim Cook at pp. 39-40). The locker room was being used by Shroder High School basketball players. *Id.* at p. 39. A coach from Shroder High School brought this to the attention of Tim Cook, the school's athletic director, during one of the tournament. *Id.* at 40. Mr. Cook immediately went to the office and had a custodian take the corkboard off the wall and out of the building immediately. *Id.* Plaintiff never saw this corkboard but only heard about it on social media. (Doc. 44, Dep. of Plaintiff at pp. 100-

101). After the incident, Mr. Cook spoke with the athletic director from Shroder High School to tell him that he was trying to investigate how it had happened and also apologized to him as well as the Principal of Shroder High School and the Athletic Department of the Cincinnati Public Schools. *Id.* at pp.41-42. Mr. Cook was not able to determine who had made the carving or when it had occurred. (Doc. 42, Ex. 2, ¶ 23 of Affidavit of Heather Cooper).

  *11. Incident Eleven*

  Plaintiff arrived to school one day on crutches. As a result, Mr. Donathan allowed Plaintiff to bring a backpack into the classroom to help carry his books. (Doc. 44, E. Fulton Dep. 62-65). He was given permission to use a backpack to carry his books, which Mr. Donathan explained to the class, after at least two students spoke out about the potential of a gun in the backpack. *Id.* A white male student, S.C., responded by saying he wished he was black so he could bring a gun to school and start shooting people. *Id.* Plaintiff reported these comments less than a week later to Mr. Donald Rabold, to whom both Eli and Mr. Fulton expressed concern for Eli's safety. (Doc. 44, E. Fulton Dep. 64, Audio tape: WBHS Dale Fulton 3.19.15 at 27:15-32:35). Mr. Rabold works in a "support service" role for the Brown County Educational Service Center that contracts with Western Brown for as needed assistance. (Doc. 49, Rabold Dep. 7; Doc. 45, Bishop Dep. 44). After this incident, Plaintiff felt he was no longer safe to return to school in the Western Brown School District and he never returned. (Doc. 44, E. Fulton dep. at 64).

  Eli chose to attend Roger Bacon High School due to its diversity and transferred out of Western Brown toward the end of the third quarter of his sophomore year. (*Id.*

128-129, E. Fulton Dep. 89-90). As a result of the transfer, Eli was prohibited by the Ohio High School Athletic Association from playing in half of the following season's basketball games. (Doc. 44, E. Fulton Dep. 116-117).

**Anti-Harassment Policy and Subsequent Investigation**

The Western Brown Board of Education's Anti-Harassment Policy requires the following: "Any teacher, administrator, supervisor, or other District employee or official who receives such a complaint shall file it with the District's Anti-Harassment Compliance Officer… within two (2) school days." (Doc. 55, Ex. 9, Board of Education School District Replacement Policy 5517, p. 7). The Anti-Harassment Policy requires the designation of a compliance officer and sets forth formal and informal complaint procedures. (*Id.* at pp. 8, 10-16).

Defendant's "Title IX and Section 504 Grievance Procedure" contains a different procedure for the handling of complaints of racial harassment and does not provide for the filing of complaints based on student-on-student discrimination. (Doc. 55, Ex. 10, Western Brown High School Student Handbook, p. 26). The 2011-2012 Mt. Orab Teacher Handbook contains no procedure for handling complaints of harassment. (Doc. 55, Ex. 7, Mt. Orab Middle School 2011-2012 Teacher Handbook).

In an attempt to address Plaintiff's claims, Donald Rabold was brought in to conduct an independent investigation. (Doc. 49, Donald Rabold Dep. 28, April 11, 2016). Mr. Rabold admitting to being "somewhat" familiar with Title VI but denied any "specific training" on the law. (Doc. 49, Rabold Dep. 16:4, 29:7-8). After finding evidence of a "relatively small group of students (defined as being between 3 and 30 students) who use racially insensitive and/or offensive language, generally conversationally and

occasionally as a direct insult towards another student," Mr. Rabold concluded that Eli's allegations were unfounded. (Doc. 55, Ex. 12, Western Brown School District Eli Fulton Complaint Investigation, p. 60, March 2014). Mr. Rabold's report was provided to the United States Department of Education's Office for Civil Rights (OCR). Based on the report, the OCR opened a class allegation to examine the existence of a hostile climate within Western Brown School District of which it had knowledge. (Doc. 55, Ex. 11, OCR Docket #15-14-1288, September 22, 2014).

## II. Analysis

### A. Summary Judgment Standard of Review

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's wholly unsupported allegations. After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in

dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986). The non-moving party's evidence "is to be believed, and all *justifiable* inferences are to be drawn in his favor." *Id.* at 255 (emphasis added). The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (citation omitted). It is the Plaintiff's burden to point out record evidence to support his claims. "[T]he Court has no duty when deciding a motion for summary judgment to scour the record for evidence that supports a plaintiff's claims." *Abdulsalaam v. Franklin County Bd. Of Com'rs*, 637 F. Supp.2d 561, 576 (S.D. Ohio 2009) (citing *Williamson v. Aetna Life Ins.Co.,* 481 F.3d 369, 379 (6th Cir. 2007)).

### B. Defendant's Motion for Summary Judgment is not Well-taken

Defendant moves for summary judgment on Plaintiff's Title VI & § 1983 claims. Defendant argues that many of the instances of discrimination alleged by Plaintiff

involve evidence that would be inadmissible at trial. Defendant asserts it is entitled to summary judgment on Plaintiff's Title VI claim because the discrete incidents of harassment alleged are not so severe or pervasive that it can be said Plaintiff was deprived of access to educational opportunities or benefits. Defendant further asserts that granting summary judgment in its favor on Plaintiff's Title VI claim is appropriate because the undisputed evidence establishes they were not deliberately indifferent to the incidents of harassment reported by Plaintiff. Rather, defendant contends its responses to the reports, i.e., investigating the incidents and disciplining the offending students, were reasonable and effective measures.

With respect to Plaintiff's § 1983 claim, Defendant argues they are entitled to summary judgment because there is no evidence that any school administrator or teacher turned a blind eye to behavior directed at Plaintiff. Defendant further argues that there is no policy or custom of inaction and there is no evidence that there is a causal link to any alleged constitutional deprivation of Plaintiff's rights.

Plaintiff contends that there are genuine issues of material fact and a reasonable jury could find that Defendant's actions or inactions resulted in a violation of Title VI of the Civil Rights Act of 1964 and 42 U.S.C. § 1983. The undersigned agrees.

**1. Title VI**

Title VI provides that "[n]o person in the United States shall, on the ground of race...be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Public education entities such as Western Brown are subject to this mandate. *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir.2012)

(citing 34 C.F.R. § 100.13(i) (2000)) (defining "recipient" to include any public "agency, institution, or organization, or other entity...in any State, to whom Federal financial assistance is extended."). A "program or activity" under Title VI includes "a local educational agency..., system of vocational education, or other school system." 42 U.S.C. § 2000d–4a(2)(B).

To hold defendant liable for racial harassment under Title VI, plaintiff must establish: "(1) the harassment was so severe, pervasive, and objectively offensive that it could be said to deprive [plaintiff] of access to the educational opportunities or benefits provided by the school; (2) [defendant] had actual knowledge of the harassment; and (3) [defendant was] deliberately indifferent to the harassment." *Maislin v. Tennessee State Unviersity*, 665 F.Supp.2d 922, 931 (M.D. Tenn. 2009) (restating the test outlined in *Davis v. Monroe County Bd of Educ.*, 526 U.S. 629 (1999).

In determining whether the alleged harassment was so severe, pervasive, and objectively offensive that it could be said to have deprived plaintiff of access to educational opportunities, courts look to the nature, frequency, and duration of the harassment, as well as its effect on the victim. *Marcum ex rel. C.V. v. Bd. of Educ. of Bloom-Carroll Local Sch. Dist.*, 727 F.Supp.2d 657, 669 (S.D.Ohio 2010) (applying the *Davis* test in the Title IX context). The Supreme Court has cautioned that lower courts should "bear in mind" that "children may regularly interact in a manner that would be unacceptable among adults" and that students "often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Davis*, 526 U.S. at 651, 119 S.Ct. 1661. "Damages are not available for simple acts of teasing and name-calling among school children...." *Id.* at 652, 119 S.Ct.

12

1661. However, courts have recognized that the frequent use of racial slurs constitutes more than "simple acts of teasing and name-calling."

For example, the Second Circuit has held that "frequent pejorative references" to a person's skin color, including "nigger," "homey," and "gangster" constituted evidence from which "the jury reasonably could have found that the harassment...endured went beyond the non-actionable 'simple acts of teasing and name-calling among school children.'" *Zeno*, 702 F.3d at 667; *see also DiStiso v. Cook*, 691 F.3d 226, 242–43 (2d Cir.2012) ("Defendants do not—and cannot—dispute that...use of the reviled epithet 'nigger,' raises a question of severe harassment going beyond simple teasing and name-calling."). The Ninth Circuit has also held that frequently being called a "nigger" by white classmates could establish harassment that was severe and pervasive. *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033–34 (9th Cir.1998) ("It does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts."). Having to endure frequent racial epithets such as these can deprive a student of the educational benefit of learning in "a supportive, scholastic environment free of racism and harassment." *Zeno*, 702 F.3d at 667.

Specifically, in analyzing a hostile environment claim, "courts have adopted a 'totality of the circumstances' approach that rejects disaggregation of the allegations and requires only that the alleged incidents cumulatively have resulted in the creation of a

hostile environment." *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F.Supp.2d 304, 319 (S.D.N.Y.2000). The Sixth Circuit has held that "the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir.1999) (emphasis in original) (analyzing a hostile environment claim under Title VII).

Here, as detailed above, Plaintiff has submitted evidence of consistent racial harassment and discrimination he experienced over the span of three years while attending school in the Western Brown School District including but not limited to:

- Plaintiff was called a "nigger" by a classmate;

- Plaintiff was told to go back to the ghetto;

- The words "no niggers allowed" were found hanging in the visiting teams locker room while he was attending the school;

- During lunch, his classmates referred to blacks as not being good at anything except running because of their history as slaves;

- Eighth grade teacher described scary kids as being non-white;

- Tenth grade teacher incited his class about affirmative action programs designed to help minorities and blamed them for the downfall of the white man;

- Plaintiff was cited as the reason for his teammate learning to hate black people; and

- A classmate told the class that he wished he was black so he could bring a gun and shoot people.

This extensive list does not include the numerous events that occurred in the halls, on the basketball court, and in class that Plaintiff experienced frequently while attending school in the Western Brown School District.

Viewing such evidence in the light most favorable to the Plaintiff as the Court must do on summary judgment, a reasonable jury could conclude from these incidents, taken together, exposed Plaintiff to racial harassment that was severe, pervasive, and objectively offensive. Accepting Plaintiff's testimony as true for the purposes of the instant motion, he suffered far more than one or two isolated incidents of racial harassment. A jury could reasonably find that the majority of the harassment to which Plaintiff testified was magnified because some came from teachers and not students. *Brooks v. Skinner*, 139 F. Supp. 3d 869, 885 (S.D. Ohio 2015).[3]

Further, a reasonable jury could conclude that Plaintiff was deprived of educational opportunities or benefits as a result of this harassment inasmuch as it "deprived him of a supportive, scholastic environment free of racism and harassment". *Brooks*, 139 F.Supp.3d at 886 (*citing* Zeno, 702 F.3d at 667). Plaintiff contends that when the racial harassment began in eighth grade, it caused him to consider leaving Western Brown but he was encouraged by his uncle, Shane Bishop, that the situation would improve in high school. Three years later, the harassment continued until Plaintiff was compelled to leave Western Brown fearing for his safety. (Doc. 54 at 14). This change caused Plaintiff to miss half of the next season's basketball games. (Doc. 54 at 12-13). A reasonable jury could conclude that driving a student to change schools

---

[3] *Citing Dept. of Educ., Racial Incidents & Harassment against Students at Educ. Insts.; Investigative Guidance*, 59 Fed. Reg. 11448, 11449 (Mar. 10, 1994) (Racially based conduct by a teacher…may have a greater impact on a student than the same conduct by a school maintenance worker or another student).

because of consistent racism and harassment goes beyond merely hindering the educational benefit of learning in a supportive, scholastic environment free of racism and harassment.

The second element of the *Davis* test is actual notice. Thus, for a school district to be liable for damages, an "appropriate person" must have had actual notice of the harassment and an opportunity to rectify any violation. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 277 (1998). It is unclear as to whether Defendant contests this prong of the *Davis* test. However, as outlined above, Plaintiff has provided enough examples of defendant's actual knowledge of the racial harassment to raise a genuine issue of fact for jury resolution on the second requirement for Title VI liability.

Turning to the third element, deliberate indifference, "can be found in cases where officials of a recipient entity with authority to take corrective action, having been advised of a Title [VI] violation, decide not to remedy the violation." *McCoy v. Bd. of Educ., Columbus City Sch.*, 515 Fed.Appx. 387, 391 (6th Cir.2013) (citing *Gebser*, 524 U.S. at 290–91, 118 S.Ct. 1989). "[A] plaintiff may demonstrate [a] defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000) (quoting *Davis*, 526 U.S. at 642, 119 S.Ct. 1661).

> The recipient is not required to "remedy" [the] harassment nor ensure that students conform their conduct to certain rules, but rather, "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." The deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." The standard does not mean that recipients must expel every student accused of misconduct. Victims do not have a

16

right to particular remedial demands. Furthermore, courts should not second guess the disciplinary decisions that school administrators make.

*Id.* (quoting *Davis*, 526 U.S. at 648–49, 119 S.Ct. 1661). However,

> [W]here a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances.

*Id.* at 261. The Sixth Circuit has further explained,

> [E]ven though a school district takes some action in response to known harassment, if further harassment continues, a jury is not precluded by law from finding that the school district's response is clearly unreasonable. We cannot say that, as a matter of law, a school district is shielded from liability if that school district knows that its methods of response to harassment, though effective against an individual harasser, are ineffective against persistent harassment against a single student. Such a situation raises a genuine issue of material fact for a jury to decide.

*Patterson v. Hudson Area Sch.*, 551 F.3d 438, 448 (6th Cir.2009).

Deliberate indifference, can be found in cases where officials of a recipient entity with authority to take corrective action, having been advised of a Title VI violation, decide not to remedy the violation. *McCoy v. Bd. Of Educ., Columbus City Sch.,* 515 Fed. Appx. 387, 391 (6th Cir. 2013) (citing *Gebser,* 524 U.S. at 290-91). A plaintiff may demonstrate a defendant's deliberate indifference to discrimination only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.  The question here is whether Defendant's actions, after the incidents taken as a whole, were reasonable in light of the given circumstances in order to satisfy the third prong of the *Davis* test.

Defendant's deliberate indifference is first demonstrated by the lack of adhering to any clear policies in addressing racial harassment within the schools. The Western

Brown Board of Education's Anti-Harassment Policy requires the following: "Any teacher, administrator, supervisor, or other District employee or official who receives such a complaint shall file it with the District's Anti-Harassment Compliance Officer… within two (2) school days." (Doc. 55, Board of Education School District Replacement Policy 5517, p. 7). The Anti-Harassment Policy requires the designation of a compliance officer and sets forth formal and informal complaint procedures. (*Id.* at pp. 8, 10-16). Neither of these procedures were explained to Mr. Fulton nor was he offered the option to file either one. (D. Fulton Aff. ¶12). Eli was not aware that there was a compliance officer. (Doc. 44, E. Fulton Dep. 134:16-25).

Furthermore, Defendant's "Title IX and Section 504 Grievance Procedure" contains a different procedure for the handling of complaints of racial harassment and does not provide for the filing of complaints based on student-on-student discrimination. (Western Brown High School Student Handbook, p. 5). The 2011-2012 Mt. Orab Teacher Handbook contains no procedure for handling complaints of harassment. (Doc. 55, Mt. Orab Middle School 2011-2012 Teacher Handbook). When asked if the teachers were provided a specific procedure for reporting complaints of harassment, intimidation, or bullying, Principal Cooper responded, "[y]eah. In their teacher handbook. It's stated report to the office." (Doc. 48, Cooper Dep. 52:23-24).

Here, the record also indicates that Principal Cooper incorrectly identified the compliance officer as the superintendent. (Doc. 48, at 56:7). Wendell Donathan could not name the compliance coordinator. (Doc. 47, Donathan, Dep. 19). School board member Shane Bishop denied having any familiarity Title VI, nor could he describe the board's policies regarding the fair and equal treatment of students. (Doc.55, Ex. 2,

Shane Bishop Dep. 11, 19-20, Apr. 22, 2016). While Principal Armstrong admitted that the Anti-Harassment policy covers racial slurs, she would not classify them as harassment unless it was used more than once or was "pervasive or persistent." (Armstrong Dep. 13:24-25, 14:18-19). Vice Principal Cook also testified that she does not consider calling a student a "nigger", one time, to be harassment. (Doc. 46, L. Cook Dep. 82). However, the definition of Race/Color Harassment in the Anti-Harassment Policy, does not require multiple uses of "racial slurs, nicknames implying stereotypes, epithets, and/or negative references relative to racial customs" prior to such behavior being qualified as harassment. (Doc. 55, Ex. 9, Board of Education School District Replacement Policy 5517, p. 5).  No reports were made to the compliance officer, as required by Policy 5517, and few understood the definition of harassment.

Here, Plaintiff suffered racial harassment for *three years* that ultimately forced him out of the Western Brown School District.  In light of such evidence, a reasonable jury could find that the defendant's responses to the racial harassments plaintiff endured were insufficient and despite plaintiff's complaints, they remained indifferent.

The dispute as to whether the harassment suffered by Plaintiff, and the action or inaction by Defendant to this harassment, satisfies the test defined in *Davis* and is a question best left to a jury.

### 2. 42 U.S.C. § 1983

Defendant further asserts that it is entitled to judgment as a matter of law with respect to Plaintiff's claims under 42.U.S.C. § 1983.  Section 1983 provides a remedy for persons who suffered a deprivation of their constitutional rights by persons acting under color of state law. 42 U.S.C. § 1983 ("Every person who, under color of any

statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]").

To succeed on a §1983 claim, a Plaintiff must demonstrate both: "(1) the deprivation of a constitutional right, and (2) the School District is responsible for that violation." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.,* 455 F.3d 690, 700 (6th Cir. 2006). Thus, Defendant will not be held liable unless Plaintiff can establish "that an officially executed policy or the toleration of a custom within the school district leads to, causes, or results from the deprivation of a constitutionally protected right." *Monell v. Dep't. of Soc. Servs.,* 436 U.S. 658, 690-693 (1978).

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell*, 436 U.S. at 694.

A municipality can be liable under § 1983 only where its policies are the "moving force behind the constitutional violation." *Canton v. Harris*, 489 U.S. 378, 389 (1989) (citing *Monell*, 436 U.S. at 694). Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a "policy or custom" that is actionable under § 1983. *Id.*

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton*, 489 U.S. at 390.

Defendant argues that there is no policy or custom of inaction and there is no evidence that there is a causal link to any alleged constitutional deprivation of Plaintiff's rights. (Doc. 42 at 26). Defendant further argues again, they responded to and resolved each and every complaint they were made aware of and thus were not deliberately indifferent to the harassment Plaintiff endured.

Plaintiff points to Defendant's Anti-Harassment Policy that was not enforced or recognized by Defendant's employees. (Doc. 54 at 16). As previously noted, none of the procedures in this Anti-Harassment Policy were explained to Plaintiff or his parents during the three years they filed harassment complaints. (Doc. 54 at 16-17). Plaintiff also provides evidence of Defendant's employees' complete lack of knowledge of the policies and procedures detailed in Western Brown Board of Education's Anti-Harassment Policy and the Western Brown Student Handbook. (Doc. 54 at 17-18). Plaintiff argues Defendant's policies and procedures for addressing complaints of racial harassment are unclear and inconsistent. (Doc. 54 at 21). Finally, Plaintiff argues that Defendant's custom of responding inadequately to Plaintiff's claims of racial harassment caused that harassment to continue. (Doc. 54 at 21).

As already explained in the Title VI, a reasonable jury could find that Defendant was deliberately indifferent to the racial harassment that plaintiff experienced. A

reasonable jury could find that Defendant's custom or policy of responding inadequately to racial harassment caused that harassment to continue, such that Defendant became a responsible entity under § 1983.

### III.  Conclusion

For these reasons, Defendant's motion for summary judgment (Doc. 42) is **DENIED** *in toto*.  This matter shall proceed to trial as scheduled.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge
